JL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas Wright, | No. CV-23-00407-PHX-GMS (CDB) |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew Neves, et al., | |
| Defendants. | |

Plaintiff Douglas Wright, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Town of Gilbert and Gilbert Police Officers Laura Johnson, Sabrina Liban, and Andrew Neves move for summary judgment on the merits of Plaintiff's § 1983 claims and his due process claim under the Arizona Constitution. (Doc. 60.) Defendants Johnson, Liban, and Neves also move for summary judgment on qualified immunity grounds. The Motion is fully briefed. (Doc. 68, 75).

The Court will grant the Motion for Summary Judgment.

## I.     Background

Plaintiff initially filed this case pro se in Maricopa County Superior Court. (Doc. 1-4 at 2-14.) Subsequently, Plaintiff retained counsel, and on February 8, 2023, he filed an amended complaint naming Defendants Town of Gilbert, Neves, Liban, and Johnson, and the individual Defendants' respective spouses. (*Id.* at 42, 76-94.) On March 8, 2023, Defendants filed a Notice of Removal and removed the case to this Court. (Doc. 1.) In a

March 15, 2023 Order, the Court determined removal was proper and referred the matter to the Magistrate Judge for pretrial proceedings.  (Doc. 4.)

In the operative First Amended Complaint (FAC), Plaintiff asserts a Fourth Amendment claim against all Defendants in Count One; a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for unconstitutional policies and customs and failure to train against the Town of Gilbert in Count Two; a Fourteenth Amendment substantive due process claim against all Defendants in Count Three; a "deprivation of civil rights" claim under 42 U.S.C. § 1983 against all Defendants in Count Four; and a due process claim under the Arizona Constitution against all Defendants in Count Five.  (Doc. 1-4 at 76-93.)  Plaintiff seeks compensatory, expectation, and punitive damages.  (*Id.* at 94.)

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.    Facts[1]

Plaintiff is a disabled military veteran and "diagnosed with generalized anxiety disorder and major depressive disorder with secondary alcohol use disorder as a result of his military service." (FAC ¶¶ 18-20.) On October 15, 2020, at 5:59 p.m., Defendants Neves and Johnson were dispatched to Plaintiff's house regarding a verbal argument between Plaintiff and Chet Christmas ("Christmas"), the purported owner of a dog Plaintiff took in three days prior. (Defs.' Statement of Facts (DSOF), Doc. 61 at 1 ¶ 1.) The dog had previously escaped from the Christmas residence. (*Id.* ¶ 2.) Shortly after arriving at Plaintiff's house, Defendant Neves spoke with Plaintiff's mother, Betty Wright ("Betty"). (*Id.* ¶ 3.) Betty informed Neves that Plaintiff was very upset and was a military combat veteran who suffered from "combat related issues," for which he receives treatment. (*Id.* ¶ 4.) Betty told Neves that Plaintiff has post-traumatic stress disorder and anxiety and was under psychiatric care for mood problems. (*Id.*) Betty also told Defendant Johnson that she heard shouting and obscenities between Plaintiff and Christmas and that she physically got between the two men before the police were called. (*Id.*) Plaintiff locked Betty out of the house, barefoot, while she was talking to Christmas. (*Id.* ¶ 6.)

Defendants Neves and Johnson first spoke to Plaintiff through the front door of his home, while Plaintiff was seated on the staircase inside. (Pl.'s Controverting Statement of

---

[1] The facts are undisputed unless otherwise indicated.

Facts (PCSOF), Doc. 69 at 8 ¶ 44.)  During the initial discussion, Plaintiff was allowed to freely roam through the front room of his property, search through multiple bags, and provide Defendant Neves with paper copies of his records associated with the dog.  (*Id.* ¶ 45.)  Plaintiff also allowed Neves and Johnson to take photographs of the documents he had in his possession.  (*Id.* ¶ 46.)  At the end of the initial interaction, Plaintiff told Neves, "real quick, you might hear it, I'm just gonna pop the mag out of my AR."  (*Id.*)  Neves responded, "do your thing man. That's all good."  (*Id.*)  Defendants Neves and Johnson did not enter the property, place Plaintiff under arrest, or otherwise take control of Plaintiff.  (*Id.* ¶ 45.)

At 6:52 p.m., while Defendant Neves was standing in the doorway to Plaintiff's residence, Plaintiff began shutting the door and informed the officers that he would terminate the interaction unless the recording officer left.  (*Id.* ¶ 47.)  Neves did not take any steps to prevent Plaintiff from closing the door, place him under arrest, or otherwise take control of Plaintiff.  (*Id.*)  Plaintiff then allowed Neves and Johnson into his house to view surveillance video of interactions at his front door between himself and Christmas, although he would not allow Neves or Johnson to hear the accompanying audio.  (*Id.* ¶ 48; DSOF ¶ 8.)  When Neves and Johnson entered the house, they observed numerous firearms throughout the house, including within feet of the front door.  (DSOF ¶ 9.)  Plaintiff informed Neves that he had guns inside the home, and Neves responded, "it's all good dude."  (PCSOF ¶ 49.)  Neves and Johnson also observed a dog matching the description of the dog for which Christmas claimed ownership.  (DSOF ¶ 10.)

Neves and Johnson watched the surveillance video, which showed footage of Chet Christmas yanking on Plaintiff's security door to open it without Plaintiff's permission.  (PCSOF ¶ 48.)  At 7:12 p.m., Neves and Johnson left Plaintiff's residence, and Johnson went to Christmas's home to continue her investigation.  (*Id.* ¶ 50; DSOF ¶ 11.)

Defendant Johnson told Christmas that the dog was considered property, and the officers would not "go in after [a] dog . . . because it's an unlawful search basically."  (PCSOF ¶ 42.) Johnson also told Christmas that "if it goes that far what they'll do is they'll

grant us a search warrant for the property and in that case that is a legal entry to grab just the property." (*Id.* ¶ 43.)

Nearly two hours later, at 9:02 p.m., Defendants Neves and Johnson returned to Plaintiff's house to urge Plaintiff to return the dog to Christmas. (DSOF ¶ 12.) Plaintiff's front door was closed when they arrived. (PCSOF ¶ 51.) Neves and Johnson had a conversation with Plaintiff at the front door. (*Id.* ¶ 52.) Plaintiff informed Defendants Johnson and Neves that he was not permitting them to enter his house, and that he was shutting the door to terminate the interaction. (*Id.*) Neves prevented Plaintiff from shutting the door, entered the residence, and placed Plaintiff under arrest. (*Id.* ¶ 53.)

Defendant Neves remained inside the residence for the next 9 minutes. (*Id.* ¶ 55.) While inside, Neves shouted out for Betty Wright to see if she was present. (*Id.* ¶ 56.) After Betty responded to Neves and met him in the front room of the residence, Neves informed her, "I'm here to get the dog," and asked her, "do we know where that dog is at?" (*Id.* ¶ 57.) Betty asked Neves where Plaintiff was. (*Id.* ¶ 58.) Neves told Betty that Plaintiff was "outside talking to the other officers." (*Id.* ¶ 59.) Betty told Neves she wanted to speak to Plaintiff, and Neves responded that Plaintiff would "be arrested for theft if we don't get the dog" and that "we need to collect the dog so he doesn't get himself in more trouble." (*Id.*) Betty gave the dog to Neves and requested that Neves also take the dog's food and medicine. (DSOF ¶ 19.)

After Plaintiff was arrested, Defendant Johnson walked Plaintiff to the sidewalk outside his home. (*Id.* ¶ 18.) Plaintiff was handcuffed for approximately 20 minutes, given a misdemeanor citation in lieu of detention, and was released at his residence. (*Id.* ¶ 20.) Defendants Neves and Johnson and the other responding officers left the property at 9:38 p.m. (PCSOF ¶ 60.) The officers left Plaintiff and Betty in the property together; none of the officers recommended that Plaintiff or Betty leave the property for the evening, and none of Plaintiff's firearms was seized. (*Id.*)

Defendant Neves wrote in his Incident/Investigation Report that Christmas presented evidence to Defendant Johnson that showed his ownership of the dog, and the

decision was made that Plaintiff was in possession of the dog, which was Christmas's property. (Doc. 61-1 at 12.) Neves wrote that he urged Plaintiff to let the officers return the dog to Christmas, but Plaintiff said he would not allow that to happen due to the conditions the dog was subjected to prior to its rescue. (*Id.*) Neves documented that he then "approached [Plaintiff] and placed him under arrest for Theft." (*Id.*) Neves did not identify any safety concerns or concerns regarding Plaintiff's behavior as grounds for Plaintiff's arrest. (PCSOF ¶ 63.) Neves described Plaintiff as "calm" during the second visit to the property. (*Id.* ¶ 64.)

On November 27 or 28, 2020, the dog again escaped from the Christmas residence. (*Id.* ¶ 82.) Defendant Liban was assigned to search for the dog. (*Id.*) Liban called Betty three times and left two voice messages. (DSOF ¶ 22.) Liban also tried to contact Plaintiff three times and left two voice messages. (*Id.* ¶ 23.) On November 28, 2020, Liban called Christmas to discuss the missing dog. (PCSOF ¶ 83.) Christmas alleged that Plaintiff had the dog because someone posted on "Nextdoor" that the dog had been returned to its owner. (*Id.*) Liban visited an animal clinic where the dog had been taken when it was found. (*Id.* ¶ 85.) Nobody at the clinic was able to identify Plaintiff as the person the dog was returned to. (*Id.*)

That same day, Defendant Liban went to Plaintiff's residence. (DSOF ¶ 24.) Plaintiff opened the front door and yelled at Liban "hello, get off my property, thank you!" and slammed the door shut. (*Id.* ¶ 25.) Liban tried to speak with Plaintiff again, but Plaintiff claimed Liban was harassing him and called 911 to report he was being harassed and was going to have a mental breakdown. (*Id.* ¶ 26.)

The next day, Defendant Liban went back to Plaintiff's residence and rang the doorbell. (*Id.* ¶ 27.) Plaintiff came to the front door. (*Id.*) Plaintiff was apprehensive but provided Liban "paperwork" for the dog. (*Id.* ¶ 28.) Detective Liban "caused an arrest report to be issued" and charges to be filed against Plaintiff on December 7, 2020. (PCSOF ¶ 87.)

## IV.   Discussion

### A.   Fourth Amendment (Count One)

In Count One of the FAC, Plaintiff alleges that no "circumstances or reasons exist[ed] to justify police entering [Plaintiff's] home without consent and without a warrant to arrest him."  (FAC ¶ 107.)

#### 1.   Town of Gilbert

As an initial matter, to the extent that Plaintiff intends to assert a standalone Fourth Amendment claim against the Town of Gilbert based on respondeat superior, he cannot do so.  "A municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents." *Long v. County of L.A.,* 442 F.3d 1178, 1185 (9th Cir. 2006). The actions of individuals may support municipal liability only if the employees were acting pursuant to an official policy or custom of the municipality.  The Court will therefore grant Defendants' Motion for Summary Judgment as to the Fourth Amendment claim in Count One against the Town of Gilbert.

To the extent that Plaintiff's claim in Count One is based on his policy and failure to train claims, the claim in Count One is duplicative of the *Monell* claim in Count Two. The Court will therefore address this claim in its discussion of Count Two.

#### 2.   Defendant Liban

As Defendants note in their Motion, Plaintiff does not specify any actions that Defendant Liban took that he contends violated his Fourth Amendment rights; rather, Plaintiff asserts his Fourth Amendment claim against "all Defendants" collectively. (Doc. 60 at 11.)  Plaintiff does not respond to Defendants' arguments regarding Defendant Liban in his Response.

There is no evidence that Defendant Liban searched Plaintiff or his home, arrested him, or seized any property from him.  Liban went to Plaintiff's home twice to conduct her investigation.  Even if Liban subsequently "caused an arrest report to be issued and charges to be filed" against Plaintiff, that does not amount to a Fourth Amendment violation.  On this record, there are no genuine disputes of material fact regarding whether Defendant

Liban violated Plaintiff's Fourth Amendment rights.  The Court will therefore grant Defendants' Motion for Summary Judgment as to the claim in Count One against Defendant Liban.

### 3. Defendants Johnson and Neves

#### a. Qualified Immunity

Under the doctrine of qualified immunity, state officials are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)).  At summary judgment, an officer may be denied qualified immunity "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quoting *al-Kidd*, 563 U.S. at 741); *see also Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (a right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law") (citing *White*, 580 U.S. at 79).  This standard "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

"The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022); *see also Kisela*, 584 U.S. at 104. "There is no analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions. Nor must § 1983 defendants come forward with precedent showing that the unlawfulness of their conduct was not clearly established." *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023).

Although a case need not be directly on point, existing precedent must "place[] the statutory or constitutional question beyond debate." *Waid v. County of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quoting *al-Kidd*, 563 U.S. at 741). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (internal quotation marks and citations omitted). "Cases cast at a high level of generality are unlikely to establish rights with the requisite specificity." *Id.* at 388 (internal quotation marks and omitted). "While a case addressing general principles may clearly establish a right in an obvious case, such obvious cases are rare." *Id.* (citations and quotation marks omitted). "Plaintiff[] must either explain why [his] case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.* (citing *Hopson*, 71 F.4th at 697).

### b.    Analysis

First, the Court concludes Defendants did not waive the issue of qualified immunity because they raised immunity in their Answer and in their Motion for Summary Judgment. *Cf. Pullano v. No. 8170, CCDC Guard*, No. 2:10-CV-00335-MMD, 2013 WL 1758999, at *2-3 (D. Nev. April 24, 2013) (noting that the defense of qualified immunity can be waived when not raised at summary judgment).

As noted, Plaintiff has the burden of showing that the right was clearly established at the time of the alleged misconduct. *Hughes*, 31 F.4th at 1223; *Kisela*, 584 U.S. at 104. Plaintiff cites one case, *Welsh v. Wisconsin*, as clearly established law governing the circumstances of this case. But *Welsh* involved the circumstances in which hot pursuit justified warrantless entry into a home to effect an arrest. 466 U.S. at 742-43. The Supreme Court in *Welsh* held only that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made," and "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Id.* at 753. *Walsh* does not apply to the facts presented here.

Defendants rely on several cases in which a warrantless arrest that occurred at a residence was determined not to violate the Fourth Amendment. In *United States v. Santana*, 427 U.S. 38 (1976), the Supreme Court upheld the warrantless arrest of a defendant who was standing within the frame of her doorway as the officers approached and who then retreated into the vestibule of her home where the officers followed and effected the arrest. The Supreme Court held that where a felony suspect was standing in her home's open doorway when police officers arrived to arrest her, the suspect's "act of retreating into her house could not defeat an arrest that had been set in motion in a public place." *Id.* at 42-43.

In *United States v. Botero*, 589 F.2d 430 (9th Cir. 1978), the plaintiff, who was under surveillance by federal officers, was followed to his home. Officers knocked on the front door, which the plaintiff opened, and the plaintiff was placed under arrest while he stood in the doorway. The Ninth Circuit applied *Santana* and upheld the legality of the warrantless arrest. *Id.*

In *United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980), the Ninth Circuit considered whether, even assuming probable cause existed, the arrest of the plaintiff in his doorway without first obtaining a warrant violated his Fourth Amendment rights. *Id.* at

756. The Ninth Circuit observed that "[a] warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment, even though exigent circumstances may not exist." *Id.* The Ninth Circuit concluded that the warrantless arrest did not satisfy *Payton* because the agents "had used a subterfuge" by misrepresenting their identities to get the plaintiff to open the door, and because of their use of that subterfuge, "Johnson's initial exposure to the view and the physical control of the agents was not consensual on his part." *Id.* at 757.

In *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995), the plaintiff saw officers through a window and "voluntarily opened the door and exposed both himself and the immediate area to them." *Id.* at 1427. The police did not enter the house until they formally placed Vaneaton under arrest. *Id.* The Ninth Circuit held that the "zone of privacy" protected by *Payton* is not implicated where (i) a suspect voluntarily opens the door of his dwelling in response to a noncoercive knock by the police, (ii) the suspect is arrested in a "public place" and exposed to public view, and (iii) law enforcement's entry into the home does not precede the arrest. *Id.*

It is true that cases following *Vaneaton* have called its reasoning into doubt. In *Florida v. Jardines*, 569 U.S. 1 (2013), officers briefly conducted surveillance on the defendant's home, then approached the home with a drug-sniffing dog, which alerted to the odor of marijuana at the front door. *Id.* at 3. Officers obtained a search warrant and found marijuana plants inside the home, which the defendant moved to suppress on the ground that the canine investigation was an unreasonable search. *Id.* at 4-5. The Supreme Court first determined that the officers' investigation took place in a constitutionally protected area, that is, the curtilage of the defendant's home. *Id.* at 7. With respect to whether the investigation "was accomplished through an unlicensed physical intrusion," the question before the Court was whether the officers' conduct "was an objectively reasonable search," which "depend[ed] upon whether the officers had an implied license to enter the porch, which in turn depend[ed] upon the purpose for which they entered." *Id.* at 10. The Supreme Court concluded that the officers' behavior "objectively reveals a

purpose to conduct a search, which is not what anyone would think he had license to do." *Id.*

In *United States v. Lundin*, 817 F.3d 1151 (9th Cir. 2016), the Ninth Circuit noted that the area "immediately surrounding and associated with the home—the curtilage—is treated as part of [the] home itself for Fourth Amendment purposes." *Id.* at 1158 (internal quotation marks and citation omitted). "Like searches and seizures inside the home itself, 'searches and seizures in the curtilage without a warrant are also presumptively unreasonable.'" *Id.* (quoting *Perea-Rey*, 680 F.3d at 1184). Thus, where officers stand on a person's front porch and knock on his door to arrest him, the officers' presence and their knock at his door "constituted a presumptively unreasonable search." *Id.* at 1158. The Ninth Circuit expressly observed that its decision in *Vaneaton* "may be on infirm ground after *Jardines*" but determined that unlike the officers in *Jardines* and in *Lundin*, the officers in *Vaneaton* were standing in the common space of a motel when they knocked, rather than in the curtilage of a home, and there was therefore "no need to overrule *Vaneaton*." *Id.* at 1160.

Defendants argue they had probable cause to arrest Plaintiff based on information they received from Christmas, Plaintiff, and Betty; "contact with the dog reported as stolen"; and "observed when Plaintiff invited them into his house." (Doc. 60 at 10.) Defendants contend that "[o]nly after Neves and Johnson returned to Plaintiff's house later the same day to retrieve the dog and Plaintiff opened the front door to have a conversation with Neves and Johnson regarding the dog, did Plaintiff protest regarding them entering his house to carry out his arrest." (*Id.*) Defendants assert that "the doorway became a public place when Plaintiff voluntarily opened the door for police officers known to Plaintiff, and Plaintiff could not evade arrest by retreating into his house." (*Id.*)

Even though the *Vaneaton* line of cases has been called into question, it has not been overruled and, thus, arguably, remains good law for some purposes. At any event, based on the continuing existence of *Vaneaton* it is impossible to conclude that Plaintiff's right to close his door and by so doing avoid arrest was "so clearly established at the time of the

incident . . . that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).  Plaintiff has not met his burden to identify a case showing that the law was clearly established that Defendants Neves and Johnson could not enter Plaintiff's home to effect his arrest under the circumstances of this case.  Accordingly, the Court concludes Defendants Neves and Johnson are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims.

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to the claims for damages in Count One against Defendants Neves and Johnson.

### B.    *Monell* Claim (Count Two)

#### 1.    Legal Standards

To prevail on a § 1983 claim against a municipality, the evidence must support that the prisoner's constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the municipality.  *Monell*, 436 U.S. at 691.  Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *Id.* at 691-94; *Mabe v. San Bernardino County*, *Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question."  *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  "Under *Monell*, a plaintiff must also show that the policy at issue was the 'actionable cause' of the constitutional violation, which requires showing both but for and proximate causation."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). The "identified deficiency" in the municipality's policies must be "closely related to the ultimate injury."  *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

A plaintiff pursuing *Monell* liability based on a failure to train or supervise must show (1) a constitutional violation; (2) a municipality's training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained its employees. *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (a plaintiff must show that the municipality exhibited "'deliberate indifference to the rights of persons' with whom those employees are likely to come into contact") (citation omitted).   Deliberate indifference in this context may be shown if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.  "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Long*, 442 F.3d at 1186.

In general, a single incident does not support a failure-to-train theory. *Benavidez*, 993 F.3d at 1154; *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.") (quoting *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997)).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.  But "[a] plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long*, 442 F.3d at 1186 (quoting *Bd. of County Comm'rs*, 520 U.S. at 409).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

**2.     Analysis**

Plaintiff has not established a genuine dispute of material fact regarding whether the Town of Gilbert's inadequate training caused the Fourth Amendment violation. "[R]igorous standards of culpability and causation must be applied to ensure that a municipality will not be held liable solely for the actions of its employee on a prohibited respondeat superior theory." *Bd. of County Commr's*, 520 U.S. at 405. The appropriate inquiry regarding causation is whether the injury would have been avoided "had the employee been trained under a program that was not deficient in the identified respect." *Harris*, 489 U.S. at 391. The policy also "must be the proximate cause of the section 1983 injury." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996). "The 'inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008) (quoting *Harris*, 489 U.S. at 378).

The only evidence regarding the Town of Gilbert's police officer training generally came from the Town of Gilbert's Rule 30(b)(6) witness, Jason Roman. Roman testified that the "Laws of Arrest 2.2" and "Search and Seizure 2.3" model lesson plans were used for trainees in the Town of Gilbert police academy. (Dep. of Jason Roman, Doc. 69-4 at 8, 10.) Roman testified that the "Laws of Arrest" lesson plan "appear[ed] to be based upon the principle foundations of making an actual custodial arrest either based upon probable cause or with an arrest warrant. It [was] not the policy that would govern Fourth Amendment, warrantless entry, or entry with an arrest warrant into a residence." (*Id.* at 9.) Roman testified that he was not personally aware of any policy within the Town of Gilbert Police Department "for felony and misdemeanor arrest warrant distinctions." (*Id.* at 9.)

The parties cite no evidence in the record regarding Defendants Neves and Johnson's particular training. Defendant Johnson testified at her deposition that she had just graduated from the academy before the October 15, 2020 incident, but there is no other deposition testimony regarding her training. (Johnson Dep., Doc. 69-2 at 4.) There is no

evidence in the record regarding Defendant Neves's training.  The parties have not retained experts who could opine regarding the adequacy of the Town of Gilbert's training.  Based on the available evidence, no reasonable jury could conclude that the model lesson plans were the proximate cause of the violation of Plaintiff's Fourth Amendment rights.

On this record, there is no genuine dispute of material fact regarding whether the Town of Gilbert had a policy or custom that resulted in a violation of Plaintiff's constitutional rights.  *See Bd. of County Comm'rs*, 520 U.S. at 410.  The Court will therefore grant Defendants' Motion for Summary Judgment as to Count Two.

### C.    Substantive Due Process (Count Three)

In Count Three of the FAC, Plaintiff contends Defendants violated his substantive due process rights under the Fourteenth Amendment.  As Defendants argue, Plaintiff cannot state a separate Fourteenth Amendment claim based on his arrest.  Claims arising during arrest are to be analyzed under the Fourth Amendment's reasonableness standard rather than the substantive due process standard.  *Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir. 1989) ("[C]laims arising before or during arrest are to be analyzed exclusively under the [F]ourth [A]mendment's reasonableness standard rather than the substantive due process standard"), *overruled on other grounds by Edgerly v. City & County of S.F.*, 599 F.3d 946, (9th Cir. 2010); *Fontana v. Haskin*, 262 F.3d 871, 881 (9th Cir. 2001) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)) ("If a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process")).

Plaintiff did not address Defendants' arguments in his Response.  The Court will therefore grant Defendants' Motion for Summary Judgment as to Count Three.

### D.    Deprivation of Civil Rights (Count Four)

Section 1983 is not a source of jurisdiction, and Plaintiff cannot assert a claim for "violation" of § 1983.  Plaintiff does not address Count Four in his Response to Defendants' Motion for Summary Judgment.  The Court will therefore grant Defendants' Motion for Summary Judgment as to Count Four.

**E.    Arizona Constitution (Count Five)**

In Count Five, Plaintiff asserts a claim under Article II, section 4 of the Arizona Constitution, which states, "No person shall be deprived of life, liberty, or property without due process of law." Defendants argue that Plaintiff's due process claim under the Arizona Constitution fails for the same reason that his Fourteenth Amendment substantive due process claim fails: that Plaintiff asserts a more specific constitutional violation, and he therefore cannot state a separate substantive due process claim. Plaintiff does not address Defendants' argument in his Response. The Court will therefore grant Defendants' Motion for Summary Judgment as to Count Five.[2]

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 60).

(2)    Defendants' Motion for Summary Judgment (Doc. 60) is **granted**, and this action is terminated **with prejudice**. The Clerk of Court must enter judgment accordingly.

Dated this 2nd day of April, 2026.

_____
G. Murray Snow
Senior United States District Judge

---

[2] Because the Court will grant the Motion for Summary Judgment, the Court need not address the parties' arguments regarding Plaintiff's lost wages.